Mr. Klinko. Thank you, Your Honor. May it please the Court. Initially, I'd like to focus on the Board's three different rationales concerning the jail content limitation. First, the Board relied on the explicit teaching of at least 30% gel in the Kapitko reference. However, the specification of the Benecke patent is specific in terms of how the gel content is calculated and it's for the entire irradiated foil. Whereas in Kapitko, there's a mixture of three components. An EPDM terpolymer that's at least 30% cross-linked, an additional ethylene or propylene component, and a polymeric modifying agent. And the express disclosure of at least 30% is only for a single component. McKay also teaches having gel content most preferably over 30%, right, which would comfortably fall within your claim limitation of 15-65% gel content. First of all, the explicit disclosure of the gel content in McKay was not relied upon by the examiner initially. The examiner relied upon the explicit disclosure in Kapitko and an optimization rationale. The Board went to the explicit disclosure in McKay as a fallback position after we raised our arguments with respect to the Kapitko gel content disclosure being for a single component. But at bottom, Shultz is nearly in anticipation, right? And it's right in the same field. And your other references, Kapitko and others, provide for a cross-linking roughly equivalent to gel content within the claimed range. So doesn't this look like a pretty good obviousness rejection? Well, getting back to Kapitko, the gel content is for a single component. McKay explicitly discloses that the preferred materials in Shultz, which are EPM and EPDM properties, such as low green strength, high susceptibility to oil attack, and resistance to ceratolastomer surface modification. And McKay also, at A88, column 2, lines 16 to 28, discloses that suitable inner polymers, for McKay's purpose, have a list of properties that are completely contradictory to EPM and EPDM. I guess the teaching that's being relied upon in McKay is that it's desirable to increase cross-linking in a polymer, and thereby also increasing the gel content. And so why wouldn't that teaching for that polymer in McKay likewise apply to whatever polymer that's being disclosed in Shultz? Well, McKay's polymers are used in foams. The word foam is in the title. It appears 74 times in the full text. The present claims recite a density range that excludes foams, and the present specification describes a reference dealing with foams and expressly states the subsequently described invention-specific methods exclude foaming conditions. That's at A42, column 1, lines 46 to 60. So Beneke's position is that a person having ordinary skill in the art would not combine McKay, which deals with these foam materials, with Shultz and Pipitco, which are not foams. And Pipitco expressly requires material that McKay expressly disparages, and the preferred materials in Shultz are also disparaged in McKay. And also, the specific teaching regarding the irradiation cross-linking in McKay is specific to foams. In the paragraph that discloses at least 30% gel content, McKay incorporates by reference a book entitled Handbook of Polymer Foams and Technology, and specifically a chapter titled Polyolefin Foam. As being useful for disclosing how to conduct the irradiation cross-linking, there's also a disclosure in McKay that if radiation cross-linking is used, the foamable structure is irradiated to cross-link the polymer material, which is then expanded. So every disclosure related to irradiation cross-linking is foam-specific. And since the present claims recite a density range that excludes foam, and the present specification expressly states that the invention-specific methods exclude foaming conditions, Beneke's position is that McKay is not analogous art. And that a person having ordinary skill in the art at the time of invention would not have combined McKay with Shultz or Pickel. The third rationale put forth by the board is an optimization rationale. Basically, the board said that Shultz discloses the vast majority of the limitations in the claims, but is silent regarding gel content, but discloses that irradiation dose is a result-effective variable. However, Shultz conducted numerous tests at different radiation dosages. He discloses a specific example. It's his best mode. It was the best that they came up with, A85 column six, that he said was especially suitable and complied with or exceeded all of the most important specifications of German automobile manufacturers. Dr. Bulsaveda submitted a declaration, and using that best mode composition and the preferred method from Shultz, he found that it only led to a gel content of 7%. A lot of the discussion of optimization also relies on McKay, which again, we think that disclosure is specific to foams, so we don't believe that McKay is properly combinable. Can you explain something that wasn't clear to me? Here we have prior art that seems to surround or be right in the middle of the range that you're claiming, and we have affidavits or declarations about this or that. I didn't see any comparisons to show that this is what happens if you follow the Shultz procedure, and this is what happens if you do ours, and one is unexpected from the other. I see plenty of criticisms of what's been cited as to the use of irradiation, for instance, but it was hard to find where there were results that one might call unexpected. In the first Bulsaveda declaration, he conducted an experiment to produce the specific composition from Shultz, and that's in paragraph 14 of his declaration on page A253. He found that that had a gel content of only 7%. Now, he said that the foil had an immaculate surface, but in paragraph 15, he said that when he tried to produce it on a larger scale, he ran into difficulties. The scalability is important, as well as the aesthetic appearance. I'd also like to point out that this was not merely a matter of discovering an optimal gel content via routine experimentation, and I'd say that the 12-year time period between Shultz and the present application, if it had been so obvious, someone in that intervening time period would have conducted the routine optimization. It wouldn't have taken 12 years. Also, in terms of the predictability, there's a lot of talk about how increasing the radiation dosage will necessarily lead to an increased gel content. The Sideron declaration itself, at age 52, showed that his sample that he irradiated with the lowest dosage actually had the highest gel content. So, while McKay might say that it would have been very easy for someone to achieve a desired gel content, that teaching is specific to foams, and Shultz does not deal with foams if you look at the density of the Shultz material also. We believe that the examiner and the board found that the claimed gel content range was optimal only because it was disclosed in the present specification and recited in the present claims. In our view, it was a clear case of an impermissible hindsight reconstruction. I'd like to reserve the balance of my time for a moment. Thank you, Mr. Grinko. Mr. Grossman? Good morning, Your Honor. May it please the Court, my name is Steve Grossman, and with me today is Beth Phillip on brief. I'd like to pick up where Judge Lurie made a comment that the Shultz reference was indeed anticipatory for all the features of the claims here in the underlying prosecution. The only feature of the claim that was not recited in the prior art was the gel content limitation. During the proceedings before both the examiner and the board, there was pervasive reference to the fact that Capico disclosed that it was optimal to achieve a 30% gel. The claim range was 15 to 65, as this Court notes. The McKay reference, which was discussed by my opponent… Did Capico really say 30% gel? Yes, Your Honor. There is a citation in Capico where Capico… I thought it was 30% cross-linking. Ah, but Your Honor, if you look at the bottom of the Capico reference, there is a footnote that says cross-linking equals gel content. So it's directly in there, unambiguous. It's in the reference. My colleague will find it. So the missing feature of the claim of 15 to 65% was established in Capico, and McKay's teaching was discussed by my opponent. My opponent has indicated that McKay should not be combined because McKay would deform structure, and his claim has a thickness and a density limitation. With all due respect to my opponent, this argument was not raised below, and it's also immaterial. Because in the McKay abstract, if you look at the very first sentence of the McKay abstract, McKay says that his materials are directed to elastomers, rubbery materials. So it's not exclusively deformed. But more basically, the issue before the court, as the court knows, is whether or not the board's decision is supported by substantial evidence. The board found that Capico was properly combinable with Schultz to establish a 30% gel content. My opponent just argued, well, you cannot consider Capico because Capico's 30% gel refers to an individual component, whereas the claims do not. The claims are broad. The claims say a polyolefin comprising. It doesn't say only one polymer in the polyolefin must have this gel content. So that argument, I think, can be dismissed out of hand. So whether or not there's substantial evidence, I direct the court to defining the fact of the boards 1 through 7, where the board went through an exhaustive consideration of the prior art with Schultz. Then the board turned to McKay. With respect to McKay, and I don't remember what the question was, but McKay itself literally said that those of skill in the art will be able to regulate and change things like radiation intensity, the type of polymer. It went into this exhaustive teaching to provide a motivation for the board to properly combine McKay with Capico and Schultz to find that the missing limitation was present in the prior art. Your Honor asked a question of Judge Newman. You asked a question as to whether or not there was anything in the prior art that established if following Schultz would give the gel content or vice versa. We submitted an affidavit of Dr. Sidaram. Dr. Sidaram followed the teachings of Schultz. Dr. Sidaram established that by following the teachings of Schultz, the gel content limitation between 15% to 65% was obtainable. We submitted the Sidaram Declaration in support of a 102 Inherency Rejection. Ultimately, the board found that Dr. Sidaram had made too many selections from the general teachings and it wasn't necessarily present. But no doubt, Dr. Sidaram, using the template of Schultz, was able to readily establish a gel content of 15% to 65%. But again, the board did not accept that on the 102 basis, but did find, and it's in the record, that Dr. Sidaram's experiments were certainly evidence of optimization. With regards to ultimately finding obviousness here, the board also found that because of McKay's instructions and because of Capico's informing as well, and there's one other reference, which was the reference of Deenan, which was an academic reference, which established that cross-linking gives gel. In fact, that goes to Judge Chen's comment. It's in Capico. It's on A192 at the bottom. It says gel content equals degree of cross-linking. So even if you put Capico aside, we have the Deenan reference, which was not referenced by my opponent, where Deenan, an academic reference, established that cross-linking gave gel. So the only missing feature in this entire debate here was that the original claim had all the features of the prior art except gel content, and the PTAB found overwhelming evidence that McKay, Capico, and Deenan would instruct one of skill in the art how to achieve that gel content readily. How do you know whether to put McKay together with Shultz, for instance, to give you a gel content in this range, unless you see what this applicant has done and reconstruct with perfect hindsight? In the board's decision, McKay – first of all, the court's standard for combination is whether there is a reasonable expectation of success in using the teachings of the art to modify a given reference. McKay itself has a direct paragraph that I believe directly answers Your Honor's question. McKay says, quote, that those of skill in the art will be readily able to adjust variables such as radiation, thickness, molecular weight, and type of polymer to achieve a gel content. If you know that that's what you're working for, and if you have to put six or seven references together in order to get there as well for the subordinate claims, that doesn't really give you a very strong case for obviousness. Your Honor, this is not a case of six or seven references. This is a case of the only missing feature of the claim was the gel content. The board looked into McKay and said, in terms of getting a desirable gel content, if that's the problem that we're trying to solve here, McKay instructs, finding a fact nine of the board, that that is readily ascertainable by those of skill in the art. We actually have two references here, the primary reference and one reference of McKay. You don't have to go to six or seven. That's the broadest claim, or the first claim. Yes. By the time you get to the subordinate claims, you have six or seven, five or six in combination. Your Honor, I have two comments on that. The subordinate claims were never argued for patentability below. There was no features of the dependent claims here that were separately argued at establishing patentable subject matter. The entire arguments below, in the record, were focused on whether or not one of ordinary skill in the art would be able to achieve a gel content. In fact, Your Honor, I'll take it one step further. Schultz established that you irradiate to cross-link. This is only a case of whether or not one can quantify cross-linking. The prior art, the admitted prior art, that you irradiate to cross-link to improve strengthening, is even cited in the background of my opponent's patent under appeal here. What about commercial success? With regards to commercial success, I believe substantial evidence supports the Board's finding that there was no nexus, Your Honor. The affidavits submitted by my opponent were shown to establish that the films that were considered all had a lacquer on them. They had a lacquer and they were shiny. And the evidence submitted to the Board was pervasive on that. My opponent had the opportunity to cure that and never did. He argued that the lacquering was irrelevant. And the Board's decision on this issue is entitled to review under substantial evidence. And I believe there was clearly substantial evidence for the Board to find that no nexus had been established between the commercial success and the claimant issue. I would also add, and perhaps my opponent argued at the end of his brief, his primary brief, that our challenge, once I pointed this out, that our challenge on the grounds of commercial, our challenge of the patent, excuse me, was an implicit admission of the commercial success of this invention. That was argued in his brief in his last paragraph. My point on that to this esteemed panel is that that is totally inconsistent with statutory construction. Our right to bring an action at the Patent Office to challenge patentability should never be construed as an implicit admission on our part of commercial success. And the second point I would add to that on your question is that with regards to commercial success, there is no evidence that we sell a product that infringes or has had any commercial success. There is no evidence whatsoever of nexus. So in answer to your question, I believe substantial evidence supports the Board's decision. I believe that in this case we are talking about a broad claim that was never amended, even though my colleague had the opportunity to do so. The arguments were on gel content, and McKay, Capico, and the academic reference of Deenan clearly established that one of ordinary skill in the art would readily be able to cross-link to a desired gel point. And the numerical feature of 15 to 65 percent was recited in Capico. It was recited in McKay. So that number was readily attainable, and I believe the Board's decision is completely supported by substantial evidence. Unless there's any other questions of this panel, I have nothing further to add. Thank you. Thank you. I'd just like to address a couple of the points raised by Hartz. First, whether the foam versus non-foam issue was argued below. We've argued consistently that the McKay reference teaches away. Additionally, Hartz raised the issue of analogous art in their own brief. So we're entitled to make that argument. Back to optimizing Schultz by merely playing with the radiation density. Dr. Hulseveda conducted additional experiments. This is in the record in his second declaration at A64, paragraph 7. And he took a polymer within the definition of Schultz, used Schultz's disclosed radiation amount, and only came up with a density range of from 0 to 6 percent gel. Regarding the Citarum declaration, this was argued about quite a bit below, and there are significant problems with the Citarum declaration. First, we have no idea how many experiments he actually conducted. Second, he admits knowledge of the Benneke patent. And third, although Hartz referred to Citarum on obviousness grounds, in their decision on rehearing, the board made explicitly clear that Citarum was not being relied upon for the obviousness grounds. Regarding Hartz's arguments concerning the reasonable expectation of success, I come back to the foam versus non-foam. And a person having ordinary skill in the art would not have even looked to McKay's foam compositions in order to modify Schultz's non-foam compositions, which have much higher density, especially when McKay teaches that EPM and EPDM, the preferred materials in Schultz, have numerous negative properties that are unsuitable for McKay's own inner polymers. A person having ordinary skill in the art simply would never have looked to McKay in order to modify Schultz and would never have combined McKay with Capitco. And Hartz also mentioned that McKay's disclosure of all these variables and said that if there was a certain desired gel content, a person having ordinary skill in the art would be able to achieve by manipulating all these variables. Well, first, you have to have the desired gel content. And the only place that desired gel content is is in the present claims, because in Capitco, it's only disclosed for one component of a multi-component mixture, and in McKay, it's only disclosed for foams. I see that my time is up. Do you have any further questions? Okay. Thank you. Thank you both. The case is taken under submission. This completes the argument cases for this session.